UNITED STATES DISTRICT COURT

WESTERN DISTRICT of WASHINGTON

UNITED STATES of AMERICA

V.

RICHARD SCUTARI,
        Defendant

CR 85-001M RAJ

_____ FILED
_____ LODGED    **MAIL**
_____ RECEIVED

**SEP 14 2020**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                    DEPUTY

## MOTION FOR A REVISED PRESENTENCE INVESTIGATION REPORT

Comes Now, Richard Scutari (hereinafter "Defendant"), pro se and respectfully moves this Honorable Court for an order to issue a new and revised Presentence Investigation Report (PSI) because certain elements in the PSI, for which the Defendant was subsequently acquitted at two separate trials, have been and are continually used by the Federal Bureau of Prisons (BOP) and the Parole Commission (Commission) to adversly effect him.

## STATEMENT OF FACTS

(1) On April 30, 1986, the Defendant pled guilty to 18 USC

1 of 7

Sections 1962 (c) and (d) and to 18 USC section 1951 of
CR 86-116 M. The latter was transferred to this District Court
under the provisions of Rule 20 of the Federal Rules of
Criminal Procedure.

(2) The Defendant and his attorney, Timothy S. McGarry, had not been
afforded the opportunity to review the Defendant's PSI until
April 30, 1986, the day the Defendant pled guilty. The Defendant
and his attorney were given five minutes to go over the PSI
and neither made any objections except for the sections which
pertain to the murder of Allen Berg. Neither prior to or at
the time of the Defendant's pleading, was the Defendant or his
attorney made aware of the Department of Justice's intention
to bring charges against the Defendant in the United States
District Court for the District of Colorado pertaing to the murder
of Allen Berg and to bring charges in the United States District
Court for the Western District of Arkansas for conspiecy to
sediciously overthrow the Government of the United States. (see
the affidavid of Timothy S. McGarry attached to the Rule 35 Motion
Exhibit 1) This is not to be construed as a Rule 32 or plea
agreement argument but rather is stated here soley for the
facts in this instant motion.

(3) The Defendant's PSI was prepared on May 27, 1986 (see PSI exhibit 2).
On page 14 and 18 the PSI makes reference to the Defendants involvement

in the Berg murder. On November 18, 1987, the Defendant was acquited, in The United States District Court for the District of Colorado, of this charge and acquitted of aiding and abetting the same. (See Exhibit 3)

(4) At the request of the Western District of Washington's Probation Office, Senior U.S. District Judge of this Court, the Honorable Walter T. McGovern, issued an order for the Denver Court's acquittal to be attached to the Defendant's PSI in order that the BOP and the Commission would be advised of said acquittal. (See Exhibits 4 and 5.) The Commission has ignored Judge McGovern's ordered attachment of the acquittal and continues to use the Berg homicide for figuring the Defendant's parole guidelines and to deny him parole.

(5) On April 7, 1988, two years after the PSI was compiled, the Defendant was acquitted of conspiracy to sediciously overthrow the Government of the United States and also acquitted of aiding and abetting the same. (See Exhibit 6) Though acquitted of this charge, many elements of this charge are found in the Defendant's PSI and were used to place a Management Varible on him in order to raise his custody level to high maximum security. (See Exhibit 7)

(6) On September 29, 1998, the Defendant was struck from behind

and knocked unconscious while on the recreation yard at USP Lompoc. The recreation yard's video camera and a tower guard's report cleared the Defendant of any wrong doing thereby resulting in the incident report being expunged from his record. Though many inmates, who used the Defendant as a football while he laid unconscious on the ground, were found guilty at their disciplinary hearings, the defendant was the only one from the incident to be transferred to the Florence ADX super-max prison. At the time of this transfer, the Defendant had ten years of clear conduct and superior programming. This transfer to the ADX was not due to the Defendant's conduct, but rather due to what was written in his PSI. (See Exhibits 7 and 8.)


(7) On December 18, 2007, the management variable for the high maximum security custody level was removed from the Defendant. Without the management variable, the Defendant's custody level points were low enough for him to be placed in a low level Federal Correctional Camp. However, the Defendant was transferred from the high security United States Penitentiary (USP) Big Sandy to a medium security, Federal Correction Institution (FCI) Estil in South Carolina. Shortly after the Defendant arrived at FCI Estil, the BOP opened a new Communication Management Unit (CMU) (aka "The Terrorist Unit") at USP Marion and needed diverse bodies to fill it. On May 7, 2008, FCI Estil filed a 409 Request for Transfer, in order to transfer the Defendant to the new CMU

4 of 7

at USP Marion. (See Exhibit 9) This was done even though the Defendant had been found guilty of only one minor three hundred series incident report in the past 17 years and was recently deem by the BOP to no longer be a high security risk. The Defendant's transfer to the CMU was not because of his conduct or security needs but was rather solely because of elements in his PSI for which he was acquitted.

(8) The Defendant was housed in the CMU from June 2008 until June on July 2010. While there, the Defendant filed FOIA/PA requests to various agencies requesting any and all records they had pertaining to him as being a domestic terrorist as noted in number 3 Rational for Referal in Exhibit 9. All results came negative except for the one from the U.S. Department of Justice's National Security Division where in it states:

"we did not locate any NSD records responsive to your request. we did, however, locate records which originated with the Federal Bureau of Prisons ,... we have referred these documents to the BOP for processing and direct response to you" (see ehibit 10)

The defendant never received these documents from the BOP nor did the BOP respond to the Defendant's original FOIA/PA request. This further shows how the elements in the Defendant's PSI for which he was subsequently acquitted have and continues to effect him.

5 of 7

## ATTACHMENTS AND REQUEST TO SEAL

The Defendant Requests this Honorable Court to seal the attached Presentence Investigation Report, Exhibit 2.

## CONCLUSION

The Defendant is in the middle of exhausting the administrative Remedy process after which he intends to file an 18 USC § 3582(c)(1)(A)(i) motion due to his high Risk of being infected with the COVID-19 virus. The Defendant believes the elements in his 1986 PSI, for which he was subsequently acquitted, will hinder his chance for success with this motion. For this Reason and those stated in 1 through 8 above, the Defendant respectfully requests this Honorable Court to issue an order for a new and revised PSI Report to be written and sent to the BOP and Parole Commission.

Respectfully Submitted                    September 10, 2020

Richard Santini

Reg. No. 34840-080

Federal Correctional Institution

P.O. Box 9

Mendota, CA 93640

# CERTIFICATE OF SERVICE

The undersigned, Richard Scutari, declares under penalty of perjury pursuant to 28 USC section 1746 that he mailed a copy of the enclosed Motion For a Revised Presentence Investigation Report to the U.S. Attorney at 700 Stewart St. #5220, Seattle, WA 98101, by placing the motion in an envelope with proper postage and handing the same to the prison's Legal Mail Officer at F.C.I Mendota, 33500 W. California Ave, Mendota CA 93640 on September 10 ,2020,


_Richard Scutari_
Richard Scutari
Date  _September 10, 2020_





Honorable Walter T. McGovern

FILED            ENTERED
LODGED           RECEIVED

OCT - 8 1987

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
7
UNITED STATES OF AMERICA,      )
8                              )
                 Plaintiff,    )      No. CR85-001M
9                              )
       v.                      )      MOTION TO REDUCE SENTENCE
10                             )      PURSUANT TO CRIMINAL RULE 35
RICHARD SCUTARI, et al.,       )
11                             )      Noted for:  October 16, 1987
                 Defendants.   )
12  _____)

13       Defendant Richard Scutari, by and through his attorney of record,

14  Timothy S. McGarry, hereby moves this court for an order reducing

15  sentence pursuant to Federal Rule of Criminal Procedure 35.  This

16  motion is made and based on the attached affidavit of counsel.

17       DATED:  This 8th day of October, 1987.

18                                   WILLIAMS, KASTNER & GIBBS

19

20                             By
                                     Timothy S. McGarry
21
                                     Attorney for Defendant
22                                     Scutari

23  //

24  //

25  //

MOTION TO REDUCE SENTENCE  -  1
PURSUANT TO CR 35

ORIGINAL                     WILLIAMS, KASTNER & GIBBS
                             1400 WASHINGTON BUILDING
                             MAIL ADDRESS. P.O. BOX 21926
                             SEATTLE, WASHINGTON 98111
                             (206) 628-6600

<u>AFFIDAVIT OF TIMOTHY S. McGARRY</u>

STATE OF WASHINGTON  )
                     ) ss
COUNTY OF KING       )

1.  I, TIMOTHY S. McGARRY, am over 21 years of age and am competent to testify herein.

2.  I was the attorney appointed to represent defendant Richard J. Scutari.  Mr. Scutari was convicted of bank robbery in violation of the so-called RICO statutes,  pursuant to 18 U.S.C. 1962(c) and (d), and 18 U.S.C. 1951.  He received a 20 year term on each of 3 counts, (for a total of 60 yrs), to run consecutive to one another.  Defendant now petitions the court to reduce that sentence.

3.  It has come to my attention that there may have been misrepresentations or omissions of fact from the United States Attorney's office in their plea negotiations with me concerning the case of the defendant.  Specifically, I was not told nor at any time did I relate to Mr. Scutari that the federal Civil Rights Division of the Department of Justice was considering filing the instant charge with which he is now being prosecuted, in the United States District Court in Denver, Colorado.  In addition, Mr. Scutari was not told, nor did the United States Government ever reveal to me, that Michelle Scutari was not an active target of the investigation at the time that he entered his plea.  This is significant in that Mr. Scutari conditioned his plea only on the promise that she would not be prosecuted.  Had Mr. Scutari been told that she would not be prosecuted at the very outset, this may have influenced his decision

MOTION TO REDUCE SENTENCE  -  2
PURSUANT TO CR 35

WILLIAMS, KASTNER & GIBBS
1400 WASHINGTON BUILDING
MAIL ADDRESS: P.O. BOX 21926
SEATTLE, WASHINGTON 98111
(206) 628-6600

1   whether to plead guilty or not.

2       4.  While these factors may render his guilty plea invalid, they

3   are also equities with which this court could take into consideration

4   in reducing his sentence.  It appears now that his plea of guilty

5   was obtained either through omissions of fact from the United States

6   Attorney's office or misrepresentation in one form or another.  A

7   reduction in sentence would go a long way in ameliorating some of

8   this harshness of these facts.

9       5.  See:  United States v. Krasn, 614 F.2d 1229 (1980), which

10  imposes upon the prosecutor a duty to disclose an informed defendant

11  during plea bargain negotiations of other federal charges which may

12  be filed.

13      6.  I would bring to the court's attention the fact that

14  Mr. Scutari had no criminal record prior to his involvement with the

15  political organization which lead him to commit these crimes.  Mr.

16  Scutari was a Navy veteran and had an excellent work career.  During

17  his stay in the Pierce County jail, he was a model inmate.  His

18  decision to plead guilty saved the government hundreds of thousands

19  of dollars and was tendered to the court in good faith premised on

20  the best interests of all of the parties.

21      7.  For these reasons, counsel would respectfully request the

22  court to reduce defendant's sentence pursuant to Criminal Rule 35.

23

24                                      TIMOTHY S. McGARRY

25      SUBSCRIBED AND SWORN TO before me this 8 day of October, 1987.

    Notary Public in and for the State of
    Washington, residing at Edmonds  My
    comm.  WILLIAMS, KASTNER & GIBBS  expires:
           1400 WASHINGTON BUILDING
           MAIL ADDRESS: P.O. BOX 21926    12-23-87.
           SEATTLE, WASHINGTON 98111
           (206) 628-6600

MOTION TO REDUCE SENTENCE  - 3
PURSUANT TO CR 35



PRC 2
(Rev. 4/84)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
**PRESENTENCE REPORT**

| NAME (Last, First, Middle) | | |
|---|---|---|
| SCUTARI, Richard Joseph | a/k/a Larry Cupp | **DICTATION DATE** 5/27/86 |

| ADDRESS Pierce County Jail Tacoma, Washington | LEGAL RESIDENCE 4654 S.E. Dryfus Ave. Stuart, Florida (parents) | SCHEDULED SENT. DATE 6/5/86  9:00 a.m. |
|---|---|---|
| | | DOCKET NO. CR85-001M |
| | | CITIZENSHIP U.S. |

| AGE 39 | RACE Caucasian | DATE OF BIRTH 4/30/47 | PLACE OF BIRTH Port Jefferson, NY | SEX Male | EDUCATION 10th Grade (GED) |
|---|---|---|---|---|---|
| MARITAL STATUS Married | | DEPENDENTS 2 children & wife | | | SOC. SEC. NO. 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 |
| FBI NO. 576 171 DA4 | | U.S. MARSHAL NO. 34840-080 | | | OTHER IDENTIFYING NO. |

**OFFENSE**
WD/WA - CT I - Racketeering Activity, Title 18, USC, 1962(c)
CT II- Conspiracy to Engage in Racketeering Activity - Title 18, USC, 1962(d)
ND/CA - CT II- Obstruction of Interstate Commerce by Robbery, Title 18, USC, 1951

**PENALTY**
Counts I & II - each 20 years/$25,000 fine, $50 assessment - WD/WA
Count II - 20 years/$10,000 fine, $50 assessment - ND/CA

**CUSTODIAL STATUS**
Detained - Total days in custody as of 6/5/86 - 79

DATE OF ARREST  verified
3/19/86  w/NCIC  RWWatson 6/17/89

**PLEA**
4/30/86 - Plea of guilty to Counts I & II - WD/WA
Plea of guilty to Count II, Rule 20 from ND/CA

CONFIDENTIAL - F.O.I.A. EXEMPT
PROPERTY OF US COURTS
SUBMITTED FOR OFFICIAL USE OF
U.S. PAROLE COMMISSION AND
FEDERAL BUREAU OF PRISONS. TO BE
RETURNED AFTER SUCH USE, OR UPON REQUEST
DISCLOSURE AUTHORIZED ONLY TO
COMPLY WITH 18 USC 4208 (b) (2).

**VERDICT**
None

**DETAINERS OR CHARGES PENDING**
None Known

RECEIVED
JUN 17
PAROLE OFFICE

**OTHER DEFENDANTS**
See Attached

PSI Available/Sent to
Attorneys_____

| ASSISTANT U.S. ATTORNEY David E. Wilson | DEFENSE COUNSEL Tim McGarry          (appointed) 2300 Columbia Center Seattle, Washington   622-8020 |
|---|---|

**DISPOSITION**

| SENTENCING JUDGE The Honorable Walter T. McGovern Chief, U.S. District Judge | DATE | PROBATION OFFICER William  CENTRAL FILE |
|---|---|---|

WD/WA-40 - Transmittal of PSR

DATE:     June 5, 1986

FROM:     William T. Peek
          U. S. Probation Officer

RE:       SCUTARI, Richard

          CR85-001M
          Docket No.

TO:    CPO, Seattle

Attached is one copy of the Presentence Report for your use in determining

place of confinement for the above offender, who was sentenced on __6/5/86__

to the following term: __20 years CAG each count (3) Total of 60 years CAG__

1.  Special Sentence Procedure:_____None_____

    _____

2.  Court Recommendation:__Confinement in a Southeastern institution if__

    __possible_____

3.  If voluntary surrender, date of surrender:___None_____

    ___In custody_____

4.  Comments or special circumstances (need for separation from others,

    medical problems, security needs, etc.   In separation cases, please

    forward documentation of need for separation in separate letter

    or memo for use in Central Inmate Monitoring Procedure.):_____

    _____None_____

    _____



RECEIVED
JUN 6 1986
CPO SEATTLE
CENTRAL FILE

DEFENDANTS - R1        _ASES STEMMING FROM THE GR.      .N AS "THE ORDER"

| NAME | COURT LOCATION | DISPOSITION |
|------|----------------|-------------|
| Andrew Virgil Barnhill | Western Dist. of WA | Convicted of four counts, 40 year sentence. |
| Daniel Bauer | District of Idaho | Pled guilty, 5 year sentence. |
| Thomas Bentley | Western Dist. of WA | Pled guilty, 7 1/2 year sentence. |
| Jean Margaret Craig | Western Dist. of WA | Convicted of two counts, 40 year sentence. |
| Eldon Bud Cutler | District of Idaho | Trial pending U.S. District Court. |
| Randolph George Duey | Western Dist. of WA | Convicted of 11 counts, 100 year sentence. |
| James Dye | Eastern Dist. of WA | Pled guilty, 20 year sentence. |
| Randall Hall Evans | Western Dist. of WA | Convicted of two counts, 40 year sentence. |
| Richard Harold Kemp | Western Dist. of WA | Convicted of 3 counts, 60 year sentence. |
| Eugene Thadeus Kinerk | Dist. of Idaho | Pled guilty.  Disposition - committed suicide on 2/23/85. |
| Ronald A. King | Western Dist. of WA | Pled guilty, 5 year sentence. |
| David Eden Lane | Western Dist. of WA | Convicted of two counts, 40 year sentence. |
| Kenneth Joseph Loff | Western Dist. of WA | Pled guilty, 5 year sentence. |
| Thomas Martinez | Eastern Dist. of WA | Pled guilty, 3 years probation. |
| Artie McBrearty | Western Dist. of WA | Convicted of two counts, 40 year sentence. |
| Robert Merki | Western Dist. of WA District of Oregon and Eastern Dist. of WA | Pled guilty, 20 year sentence. |
| Sharon Merki | Western Dist. of WA District of Oregon | Pled guilty, 20 year sentence. |
| William Nash | Eastern Dist. of WA | Pled guilty, 5 years probation. |
| Jackie Lee Norton | Eastern Dist. of WA | Pled guilty, 5 years probation. |
| Charles Ostrout | Northern Dist. of CA | Pled guilty, 5 years. |
| Denver Daw Parmenter, II | District of Oregon | Pled guilty, 20 years. |
| Bruce Carroll Pierce | Western Dist. of WA | Convicted of 5 counts, 100 year sentence. |
| Randall E. Rader | Eastern Dist. of WA | Pled guilty, 5 years probation. |

CENTRAL FILE

| NAME | COURT LOCATION | DISPOSITION |
|---|---|---|
| Frank Silva | Western Dist. of WA | Convicted of 3 counts, 40 year sentence. |
| Ian Royal Stewart | Western Dist. of WA | Pled guilty, split sentence, 5 years probation. |
| Libby Stewart | Dist. of Oregon | Pled guilty, 5 years probation. |
| David Tate | Western Dist. of WA | Not prosecuted.  Serving life sentence in State of Missouri. |
| Katherine Suzanne Tornatzky | District of Idaho | Pled guilty, 10 years imprisonment. |
| Eric Tornatzky | District of Oregon | Pled guilty, 5 years probation. |
| Gary Lee Yarbrough | Western Dist. of WA | Convicted of 3 counts, 60 year sentence. |
| George Zaengle | Eastern Dist. of WA | Pled guilty, 5 years probation. |

\*          \*          \*          \*          \*          \*

CR85-132M   1. **Robert Donohue** - sentenced 9/24/82 to CAG 5 years imprisonment on Count I; Count VII, ISS; placed on 5 years probation.  On 5/6/83, the sentence was modified to time served.

2. **Karen Donohue** - sentenced 9/24/82 on Count I to 90 days CAG; Count VII, ISS, 5 years probation.  On 6/16/83, Count I was modified - 90 days imprisonment was changed to 5 years probation.  Ms. Donohue remains under supervision in this District to USPO Suing.

3. **Eric Tornatzky** - sentenced 5/24/85, ISS; 5 years probation.  Special Conditions; 1) Fine of $2,500; 2) 250 hours of community service. On 6/21/85, supervision was transferred to the District of Idaho, Boise.

4. **Tabitha Stewart (Hagle)** - sentenced 5/24/85, ISS; 5 years probation. Special Conditions: 1) $2,500 fine;  2) 150 hours community service.

CENTRAL FILE

**OFFENSE:**

**Prosecution Version:** On July 18, 1985, the Federal Grand Jury for the Western District of Washington returned a 21 Count Indictment (Second Superseding Indictment) charging 23 defendants with being part of an enterprise which engaged in a pattern of racketeering activity (Count I), conspiracy to engage in a pattern of racketeering activity (Count II), and with 19 other Counts charging various defendants with conspiracy, obstruction of commerce by means of robbery, transportation of stolen money in interstate commerce, receipt and concealment of stolen money, harboring a fugitive, possession of an unregistered firearm, possession of firearms and ammunitions by fugitives from justice, and attempted destruction of a building by means of an explosive. (A summary of each Count of the Indictment is to follow.)

Several of the 23 defendants have entered pleas of guilty to various charges and have already been sentenced. Ten defendants entered pleas of not guilty to the Indictment and requested a jury trial. These ten defendants are: Bruce Carroll Pierce, Gary Lee Yarbrough, Randolph George Duey, Andrew Virgil Barnhill, Richard Harold Kemp, David Eden Lane, Randall Paul Evans, Frank Lee Silva, Jean Margaret Craig, and Ardie McBrearty.

The jury trial in this matter took place in Seattle, Washington, beginning on September 9, 1985, before Chief U.S. District Judge Walter T. McGovern. Each of the ten defendants was represented by legal counsel. The trial lasted a total of 79 days, the jury returning its verdict on December 30, 1985, following several days of deliberation.

**Summary of Indictment:** The Second Superseding Indictment names 23 different individuals as defendants, includes 21 counts, and is 124 pages in length.

**COUNT I:** Count I charges all 23 defendants with being employed by and associated with an enterprise engaged in a pattern of racketeering activity in violation of Title 18, United States Code, Section 1962(c). Count I consists of 82 pages and is summarized as follows:

Sections 1 through 12 (pages 6-9) describe "The Enterprise," including its purposes and methods used by members of The Enterprise to shield themselves from the scrutiny of law enforcement authorities.

Sections 13 and 14 (pages 9-14) describe the roles of each of the 23 defendants named in the Indictment.

Sections 15 and 16 (pages 14-40) enumerate 67 separate ACTS OF RACKETEERING ACTIVITY and summarize the specific acts committed by each of the 23 defendants. These alleged acts occurred between October 28, 1983, and December 11, 1984. They were committed by various defendants at various times during this period and often more than one defendant was involved in the commission of each act.

CENTRAL FILE

The 67 alleged acts are summarized as follows:

1. Robbery of a video adult book store in Spokane.
2. Two instances of manufacturing counterfeit money ($50 and $10 bills).
3. Conspiracy to rob armored cars in Washington and California.
4. At least two bank robberies, one in Seattle and one in Spokane.
5. The robbery of at least three armored cars, two in Seattle and one in California.
6. The firebombing of a theater in Seattle.
7. The attempted arson of a Jewish synagogue in Boise, Idaho.  (This alleged act was stricken by Court Order.)
8. The commission of at least two murders.
9. The possession and transportation of counterfeit money across state lines.
10. Shooting at and attempting to murder FBI agents on at least two occasions.
11. Numerous instances of possessing, transporting, concealing, or storing money known to have been stolen from banks or armored cars by members of "The Order."

Section 17 of Count I (pages 40-82) sets forth forfeitures the Government is seeking as a result of the defendants' commission of the crimes alleged in Count I.  Twenty-two of the 23 defendants are listed in this section and the forfeiture categories included are money, motor vehicles, weapons, personal property, and explosive materials.  Many of these items were seized during the investigation and following the arrests of the defendants.  The total number of items sought to be forfeited is approximately 512, according to the Indictment.  (Following the jury verdict, all of the defendants have agreed to the forfeiture of the items identified in the Indictment.)

COUNT II:  Count II charges all 23 defendants with Conspiracy to Engage in a Pattern of Racketeering Activity in violation of Title 18, United States Code, Section 1962(d).  Section 1 realleges the allegations of Paragraphs 1 through 13 of Count I and incorporates them by reference into Count II.  Section 2 states the conspiracy charge.  Section 3 cites the "Manners and Means" by which the defendants attempted to carry out the conspiracy.  There are 24 paragraphs in this Section which basically cite the "acts of racketeering activity" previously set forth in Count I as the manner and means to carry out the conspiracy (pages 83-89).

Section 4 of Count II (pages 89-112) allege 176 overt acts committed by various defendants between July, 1983, and April, 1985.  These acts include the founding of "The Order," many of the "acts of racketeering" set forth in Count I, the renting of homes and storage facilities, the purchase of numerous vehicles and weapons, the possession of weapons and explosives, travel across state lines, possession of false identification, and meetings of various defendants during this time.

CENTRAL FILE

Section 5 of Count II (page 113) sets forth the forfeitures sought by the Government in this case. They include assets listed in the "forfeitures" section of Count I but are not limited to only the items in that section.

**COUNT III:**  Count III charges Pierce, Duey, Parmenter, and Kemp, (as well as the deceased Robert Mathews) and others with conspiracy to rob the Continental Armored Transport Company in or about November, 1983. (Title 18, USC, Sections 1951 and 2).

**COUNT IV:**  Count IV charges Pierce, Yarbrough, and Duey (and Mathews) with obstructing commerce and the movement of articles and commodities in commerce by robbery of a Continental Armored car in Seattle on March 16, 1984 (Title 18, USC, Sections 1951 and 2).

**COUNT V:**  Count V charges Pierce, Yarbrough, Duey, Barnhill, Parmenter, and Kemp (and Mathews) with obstructing commerce in the movement of articles and commodities in commerce by robbery of a Continental Armored car in Seattle on April 23, 1984 (Title 18, USC, Sections 1951 and 2).

**COUNT VI:**  Count VI charges Barnhill (and Mathews) with transportation of stolen money in interstate commerce from Seattle to Missoula, Montana, between April 23 and April 26, 1984 (Title 18, USC, Sections 2314 and 2).

**COUNT VII:**  Count VII charges Duey alone with transportation of stolen money in interstate commerce from Oregon to Whidbey Island, Washington, in November, 1984 (Title 18, USC, Section 2314).

**COUNT VIII:**  Count VIII charges Duey alone with concealing and storing stolen money at Whidbey Island, Washington, on December 7, 1984 (Title 18, USC, Section 2315).

**COUNT IX:**  Count IX charges Robert and Sharon Merki with transportation of stolen money in interstate commerce from Oregon to Whidbey Island between November 1 and November 18, 1984 (Title 18, USC, Sections 2314 and 2).

**COUNT X:**  Count X charges Robert and Sharon Merki with concealing and storing stolen money at Whidbey Island, Washington, on December 7, 1984 (Title 18, USC, Sections 2315 and 2).

**COUNT XI:**  Count XI charges Scutari and Silva with transportation of stolen money in interstate commerce on or about December 6, 1984, from Whidbey Island, Washington, to Salt Lake City, Utah (Title 18, USC, Sections 2314 and 2).

**COUNT XII:**  Count XII charges Scutari and Silva (and Mathews) with concealing and storing stolen money at Whidbey Island, Washington, between November 25 and December 6, 1984 (Title 18, USC, Sections 2315 and 2).

CENTRAL FILE

**COUNT XIII:**  Count XIII charges Duey, Scutari, Robert and Sharon Merki, Silva, and others known and unknown to the Grand Jury with harboring and concealing Robert J. Mathews at Whidbey Island between November 24 and December 7, 1984 (Title 18, USC, Sections 1071 and 2).

**COUNT XIV:**  Count XIV charges Duey alone with possession of a hand grenade on December 7, 1984, at Whidbey Island (Title 26, USC, Sections 5861(d) and 5871).

**COUNT XV:**  Count XV charges Duey alone with possession of an Uzi machine gun at Whidbey Island, Washington, on December 7, 1984 (Title 26, USC, Sections 5861(d) and 5871).

**COUNT XVI:**  Count XVI charges Duey alone with possession of 12 ounces of explosives at Whidbey Island, Washington, on December 7, 1984 (Title 26, USC, Sections 5861(d) and 5871).

**COUNT XVII:**  Count XVII charges Robert and Sharon Merki with possession of an unregistered 9 millimeter Uzi machine gun at Whidbey Island on December 7, 1984 (Title 26, USC, Sections 5861(d) and 5871 and Title 18, USC, Section 2).

**COUNT XVIII:**  Count XVIII charges Robert and Sharon Merki with possession of a 9 millimeter Uzi machine gun having the serial number obliterated and removed on December 7, 1984, at Whidbey Island, Washington (Title 26, USC, Sections 5861(h) and 5871 and Title 18, USC, Section 2).

**COUNT XIX:**  Count XIX charges Robert and Sharon Merki, being fugitives from justice, with transporting and receiving six firearms in interstate commerce between November 10 and December 7, 1984 (Title 18, USC, Sections 922(g) and (h) and 924(a) and Title 18, USC, Section 2).

**COUNT XX:**  Count XX charges Robert and Sharon Merki with being fugitives who knowingly transported and received various quantities of ammunition shipped and transported in interstate commerce between November 10 and December 7, 1984, at Whidbey Island, Washington (Title 18, USC, Sections 922(g) and (h) and 924(a) and Title 18, USC, Section 2).

**COUNT XXI:**  Count XXI charges Pierce, Yarbrough, Duey, Barnhill, and Kemp with damaging The Embassy Theater in Seattle by an explosive on April 22, 1984 (Title 18, USC, Sections 844(1) and 2).

**Court Order on Motions For Judgments of Acquittal and Motion to Strike:**
On December 10, 1985, Chief U.S. District Judge Walter T. McGovern issued an 18 page Order after consideration of various defense motions to acquit as well as strike various portions of the Indictment.  Certain of these motions were granted and certain were denied.

CENTRAL FILE

Scutari has entered a plea of guilty to Count I and II of the second Superseding Indictment under Cause No. CR85-001M on April 30, 1986.

On the same date he pled guilty to Count II of the Indictment handed down in the Northern District of California under 85-0476.  Count II of this Indictment reads as follows:

### COUNT II: (18 U.S.C. § 1951)

"The Grand Jury further charges:  T H A T

On or about July 19, 1984, in Mendocino County, within the State and Northern District of California,

> BRUCE CARROLL PIERCE,
> GARY LEE YARBROUGH,
> RANDOLPH GEORGE DUEY,
> ANDREW VIRGIL BARNHILL,
> RICHARD HAROLD KEMP,
> RICHARD E.  SCUTARI, and
> RANDALL PAUL EVANS,

defendants herein, and others known to the Grand Jury, did knowingly and willfully obstruct, delay and affect interstate commerce by unlawfully taking and obtaining approximately 3.6 million dollars from the persons and presence of employees of the Brinks Armored Service Company, against their will, by means of actual and threatened force, violence and fear of injury to said employees."

A brief summary of the written Plea Agreement in this case indicates that Scutari will plead guilty to Counts I and II of the second Superseding Indictment in Western Washington and Count II of the Indictment in the Northern District of California under Rule 20.  He understands that the maximum penalty is 60 years imprisonment with the fines and forfeitures which have been set out.  He also agrees to voluntary forfeiture of various properties and articles received from the proceeds of his criminal activity.  The Government agrees to dismiss at the time of sentencing any and all outstanding charges in any and all districts including the Southern District of Texas in connection with weapons which were seized at the time of his arrest.  The Government agrees to recommend that the defendant serve any sentences imposed in an appropriate facility in the Southeastern United States.  The Government also agrees that the defendant's wife will not be charged in any possible violations arising from her association with the defendant.

<u>Details of Offense</u>:  The following description of this offense has been summarized from various documents on file with the Court, a memorandum

CENTRAL FILE

supplied by the U.S. Attorney for the Western District of Washington and based upon the FBI investigation into this matter, as well as verbal information provided by the U.S. Attorney.

In recent years, various members of law enforcement agencies have become aware of an expanding "white supremacist group" referred to as The Aryan Nation. This group established its church, training compound, and main headquarters near Hayden Lake, Idaho, and has been directed for the past ten years by Richard G. Butler. That facility and headquarters is located approximately 35 miles east of Spokane, Washington.

At various times during the past few years, Mr. Butler and his association have received considerable media attention and he has been quoted by different media sources as saying, "This is where we and fellow white separatists can create a separate state for our race-the territorial imperative." More recently, in a newspaper article, Mr. Butler was quoted as saying, "Race and religion are inseparable beliefs of the Aryan Nation and the Pacific Northwest is the last white American bastion where they can be practiced."

Because of the somewhat remote location of Butler's compound and because of his personal charisma and beliefs, various individuals from many parts of the United States have been attracted to his church and to this location.

Since approximately August, 1984, FBI agents in Butte, Montana, San Francisco, California and Seattle, Washington have been investigating a series of offenses involving armored car robberies, murders, arsons, counterfeiting, and numerous instances of interstate transportation of stolen property. On October 5, 1984, Thomas Martinez was arrested on counterfeiting charges in Philadelphia, Pennsylvania, pleaded guilty to the charges, and agreed to cooperate with investigators. Martinez, as well as at least one other informant, has been instrumental in providing the FBI with extensive information concerning a group known as "The Order."

**Origins of The Order:** The Order is essentially an offshoot of the Aryan Nations church operated by Mr. Butler in Hayden Lake, Idaho. Several of the individuals who were attracted to Mr. Butler's church eventually became discouraged with his approach to leadership, particularly because he was not sufficiently radical or militant. Consequently, approximately ten individuals who received their early indoctrination and training at the Aryan Nation compound near Hayden Lake, broke off and organized into a splinter group, calling themselves "The Order" or "The Bruders Schweigen" (meaning "The Silent Brotherhood"). They also utilized other names from time to time, including "The Underground," "The White American Bastion," and "The Aryan Resistance Movement."

This severance from the Aryan Nation began in the fall of 1983 with organizational and planning meetings of the core group comprised of Robert J. Mathews, Bruce Carroll Pierce, George Randolph Duey, Denver Daw

CENTRAL FILE

Parmenter, Richard Harold Kemp, Kenneth Joseph Loff, and David Eden Lane. Hereafter, this group came to be more widely known as "The Order" and was referred to as such in various reports in the news media.

**Leadership and Initiation of Members:** The original organizers of the Silent Brotherhood watched membership of the order grow within a few months to approximately 25 to 30 people. They had set up initiation procedures and began studying books on forming and maintaining an underground paramilitary unit. The original members were reportedly influenced greatly by a book called <u>The Turner Diaries</u> and also relied heavily on such books as <u>The Road Back</u> which is described as a "cookbook" for such things as structuring a paramilitary underground organization, developing codes, using explosives, and related concerns.

The leader of The Order was clearly Robert J. Mathews. He was apparently instrumental in naming the organization and establishing initiation rituals, as well as other trappings of a "fraternal" organization. As each member joined, he or she pledged an oath that they would not be detoured from their various activities until their goals had been accomplished.

The Order used symbols to signify its existence. The primary symbol was a medallion bearing the "Bruders Schweigen" motto which was to be worn around the neck. A number of these medallions were recovered following the arrest of various members of The Order. Additionally, The Order used code names to identify its members and associates; a chain of command; a formal interstate communication system; and an organizational structure complete with management levels and specialized functions.

**Goals of The Order:** Members of The Order held "extreme, right wing political views," focusing on anti-Semitism, neo-Nazism, and related thinking. The basic philosophy was similar to that of the Aryan Nations church, that is, that a cataclysmic race war is inevitable. Simply stated, the goals of "The Bruders Schweigen" were to create a separate white state and turn over all political power to white Christians.

In order to accomplish these goals, members apparently had to be willing to rob, burn, and murder in the name of these views. According to the Government, The Order was explicitly dedicated to the goal of "spearheading" these views which include violent and all-pervasive anti-Semitism, adoption, in whole or in part, of much of the dogma, trappings, and goals of Nazi Germany, and a dedication to initiating and consummating a revolution in the United States along racial and/or ethnic lines.

The individuals attracted to The Order were almost entirely persons with previous associations with extreme right wing causes, such as the Ku Klux Klan, various neo-Nazi organizations, and various "Identity Christian" congregations. Certain defendants who have been debriefed fully admit their political leanings and have explained that Mathews offered an oppor-

CENTRAL FILE

tunity to engage in action rather than "just talking" about "race" problems. Also, most of the members of The Order were financially strapped and the efforts of the group provided them with huge amounts of money which were utilized by everyone for purely personal creature comforts, such as cars, audio and video equipment, and extensive travel.

The Order was intended to be a national underground organization to exert itself as a guerrilla group in order to help finance various white supremacy groups. The Order set up seven steps to accomplish this goal:

1. Form the organization.
2. Establish a war chest.
3. Acquire money through armed robberies.
4. Recruit new members.
5. Commit assassinations of alleged enemies, including government officials.
6. Expansion of the guerrilla movement itself.
7. Formation of an army.

**Methods of Financing Activities of The Order:** To accomplish the goals of The Order, the group needed funds and weapons. Funds, in the form of money estimated to be between four and five million dollars, were accumulated by means of a variety of criminal activities taking place in a few short months. Initially, Robert Mathews attempted to fund the movement by counterfeiting U.S. currency on the printing press of the Aryan Nations church in Hayden Lake, Idaho. He was assisted in this early counterfeiting venture by Lane, Yarbrough and Pierce. However, the initial counterfeiting did not produce bogus bills of the highest quality, although the bills were passed with limited success. In fact, Pierce was caught passing counterfeit money in Eastern Washington, was convicted, and became a fugitive when he failed to report as directed after sentencing.

Early on, The Order considered robbing such "socially undesirable" targets as pimps, pornography stores, and "dope dealers." Efforts to effect such robberies foundered for several reasons, although Pierce, Duey and Mathews robbed a pornography store in Spokane in October, 1983, which netted approximately $300. As a result, The Order decided to seek out juicier targets. These targets included banks and armored car companies. Additionally, The Order made another effort at producing counterfeit money, some of which was apparently passed successfully.

Some of the major crimes committed by members of The Order are summarized in a following section.

The "war chest" accumulated by The Order was used to establish salaries of $400 per week for its members, as well as "employee benefits" such as rest and recreation leaves, automobiles, expenses, and bonuses. Money was also used to purchase approximately twenty acres of land in the Priest

CENTRAL FILE

Lake, Idaho, area to use as a training facility. Additionally, surrounding acres of land were also leased for this purpose. The training facility was operated by Randall Rader whose sole function was to train new recruits in paramilitary tactics. Subsequently, Rader also purchased additional land in Missouri for the same use.

**Methods of Communication Used by The Order:** The Order developed an organizational structure complete with management levels and specialized functions. They also developed code names to identify members and associates, a chain of command, and a formal interstate communications system, consisting of message centers and mail drops.

Staff members, some of whom were scattered throughout the United States, predominantly in the West, were required to communicate daily by calling in to constantly shifting telephone "message centers" operated throughout the country. Centers were located at various times in Washington, Idaho, Florida, Texas, Arizona, Oregon, and California. Certain written material recovered after the arrest of some members of The Order stated that every staff member is responsible for making sure that every man in his command sector has memorized the "bear trap number" and the current message center number. (The "bear trap number" was to be utilized in case of arrest. Arrested members would call the number to be furnished with bail money and defense counsel.)

The Order also adopted numerous underground methods of avoiding law enforcement scrutiny, including false identities through the use of "dead baby" birth certificates and other means. Documents recovered in searches include Order rules requiring each member to carry at least one set of false identification documents at all times. Additionally, The Order established numerous "safe houses" throughout the Western United States where members could lay low between "jobs" and utilize illegal radio systems for communicating beyond the frequencies authorized for use by citizens band owners. The Order also hired its own locksmith (William J. Nash) and utilized a gun shop owner is Spokane, Washington, as an armorer.

**Summary of Crimes Committed by Members of The Order:**

CONSPIRACY TO ROB AN ARMORED CAR IN SEATTLE IN NOVEMBER, 1983:

In November, 1983, The Order began considering robbing armored cars as a means of funding their activities and as a means of obtaining money for their own uses. (According to information developed by the FBI, Mathews had already quit his employment by this time and Duey and Parmenter both ended their respective jobs in March, 1984. Andrew Barnhill, a new convert from Montana, quit working in approximately April, 1984.)

During November, 1983, a number of Order members journeyed to Seattle to survey armored car routes and map out a robbery. Those making the

trip were Mathews, Pierce, Parmenter, Duey, Soderquist, and Dan Bauer. Upon arriving in Seattle, the group surveilled armor car routes and retired to consider the best ones to hit. Bauer, shortly thereafter, lost interest in this project.

ARMORED CAR ROBBERY IN SEATTLE ON MARCH 16, 1984:

On March 16, 1984, Mathews, Pierce, Yarbrough and Duey robbed an armored car courier in Seattle as he was leaving a Fred Meyer Department Store with a sack of money. In committing this crime, they knocked the courier down, grabbed the money, and fled. The take was approximately $44,000 in currency and some non-negotiable papers.

ARMORED CAR ROBBERY IN SEATTLE ON APRIL 23, 1984:

On April 23, 1984, a Continental Armored transport truck was held up by seven men in a shopping center in North Seattle. The men wore stocking masks, were armed with a variety of weapons, and announced their presence by having one man stand in front of the truck holding up a sign telling the occupant to "get out or you die." The take was approximately $500,000. Investigation revealed that the seven participants were Mathews, Yarbrough, Pierce, Duey, Barnhill, Kemp, and Parmenter.

ARSON IN SEATTLE:

On April 22, 1984, prior to the robbery on April 23, 1984, Gary Yarbrough set off a bomb causing an explosion at The Embassy Theater, a pornographic movie theater in downtown Seattle. The plan was apparently to divert the police from the Seattle robbery the following day. A telephone threat to the theater was utilized and Parmenter and another participant also spread nails on a nearby street, hoping to create a traffic snarl. (It should be noted that all defendants charged with this crime in Count XXI were acquitted.)

SYNAGOGUE ARSON IN BOISE ON APRIL 29, 1984:

On April 29, 1984, Bruce Pierce detonated a dynamite bomb in a synagogue in Boise, Idaho. Approximately $5,000 in damage was done to the synagogue. (It is noted that this allegation, listed as an "act of racketeering activity" in Count I, was ordered stricken from the Indictment by Court Order, even though Pierce confessed to the crime, because the Court found that it was outside the scope of the conspiracy.)

COUNTERFEITING IN NEWPORT, WASHINGTON, IN MAY, 1984:

Some of the proceeds from the armored car robberies in Seattle were used to purchase a new printing press to be used to renew and upgrade the counterfeiting efforts of The Order. The printing press was purchased in Denver, Colorado, by Lane and Robert Merki and installed in a "safe

house" rented by Duey and Parmenter in Newport, Washington. Merki and Lane, assisted by Duey and Parmenter, then began experimenting with paper and dyes at the Newport house and began running off bills. However, their activities were interrupted by an unexpected visit from local law enforcement authorities who were looking for Pierce, then a fugitive on an earlier counterfeiting charge. Although the counterfeiting operation was not discovered by police, Lane and Merki became nervous and moved the printing press to a house rented by Merki in Boise, Idaho.

COUNTERFEITING ACTIVITIES IN BOISE AND PHILADELPHIA IN JUNE, 1984:

After the printing press was moved to the house in Boise, Robert Merki and Lane completed the printing of a large number of ten dollar bills. Lane took approximately $30,000 of the bogus ten dollar bills to Philadelphia where he enlisted the assistance of Thomas Martinez and George Zaengle to cut up the bills and pass them in the Philadelphia area. Lane provided the two with a list of instructions entitled "Do's and Don'ts of Counterfeiting." It is noted that Martinez was arrested while passing some of these bills.

MURDER OF WALTER WEST IN IDAHO ON MAY 27, 1984.

Some time in mid- or late-May, 1984, Thomas Bentley, an official of the nearby Aryan Nations church, went to the home of Robert Mathews in Metaline Falls and told him that another member of the church, Walter West, had a loose tongue and was talking freely about the church and Order business to outsiders. Mathews reportedly assigned the job of killing West to Duey, Dye, Kemp and David Tate. West was apparently lured into a wooded area in northern Idaho by these four men at which time Kemp struck him in the back of the head with a hammer. Duey then shot West in the head with a rifle. Dye helped bury the body.

MURDER OF ALAN BERG IN DENVER ON JUNE 18, 1984:

Alan Berg was a Denver radio talk show host who was also Jewish. He delighted in holding various people and movements up to ridicule, including those on the far right. Berg was hated by members of The Order as a Jew and as a particularly abrasive representative of what The Order perceived as the "Zionist-controlled media." On June 18, 1984, Berg was murdered by a gunman who shot him thirteen times with a machine gun as he got out of his car at his home. The murder weapon was later recovered in a search of Yarbrough's home in Sand Point, Idaho, following his October assault on federal officers. The FBI investigation identified Pierce as the trigger man in this crime. Lane was identified as the getaway driver and Mathews and Scutari had been present as back-ups but did not actively participate in the shooting. Jean Craig was identified as having done the intelligence work for the Berg murder in that she went to Denver and followed Berg around, learning his work habits, where he lived and other such details.

-14-

ARMORED CAR ROBBERY IN UKIAH, CALIFORNIA, ON JULY 19, 1984:

On July 19, 1984, a Brinks truck was robbed by a number of white males who brandished various weapons, including at least one automatic weapon which was fired into the truck when it had stopped and a guard refused to come out. After the truck had been forced off the road, a man stood in front of the truck with a sign telling the occupants to "get out or die." The robbers made off with 3.6 million dollars in currency. The FBI has identified those actively participating in the robbery as Mathews, Yarbrough, Duey, Parmenter, Scutari, Robert Merki, Kemp, Soderquist, Pierce, Barnhill, Evans, and Dye. During the course of this robbery, Mathews left a hand gun in the truck which was subsequently recovered and traced as having been purchased by Barnhill in Montana in April, 1984.

TRANSPORTING THE LOOT FROM UKIAH, CALIFORNIA, TO BOISE, IDAHO:

After the robbery, the robbers laid low in California for the night and the following day, July 20, 1984, transported the stolen 3.6 million dollars from California to Reno, Nevada. On July 21, 1984, the robbers set out on a staggered caravan from Reno to the home of Robert Merki in Boise, again transporting the loot across state lines.

CONCEALING AND DIVIDING UP THE 3.6 MILLION DOLLARS:

After arriving in Boise on July 21, 1984, the stolen money was taken to the home of Robert Merki where it was counted. Sharon Merki and her daughter, Suzanne Stewart, assisted in the counting of the money.

The money was counted and each of the robbers received $30,000 as a bonus and $10,000 for six months salary. In addition, David Lane, Sharon Merki, Suzanne Stewart, and Jean Craig each received $10,000 and Sharon Merki's juvenile son also received $3,000.

The remainder of the money was divided between Mathews and Bruce Pierce for use in the movement. The 1.5 million dollars given to Mathews was loaded by Robert Merki, Lane and Loff into Loff's station wagon, which Loff then drove to his Ione, Washington, farm where it was buried in the outbuildings. Pierce got approximately $700-800,000 to be used for additional recruiting and to found a new cell.

Much of the stolen money went for creature comforts such as automobiles, stereo and audio equipment, travel, and other such expenditures. Some of it went to purchase weapons and other items for use of the individuals or The Order. Some of it was given to extreme right wing organizations such as the Ku Klux Klan and the National Alliance.

The money buried on Loff's farm near Ione, Washington, was distributed by Loff to people designated by Robert Mathews. In August, 1984, Loff gave Richard Harold Kemp $230,000 and David Eden Lane $310,000. Later in the month, Lane returned to Ione and received another $100,000, which he indicated he was giving to Louis Beam, a Texas Klan leader. Money was also used to open the "Mountain Man Survival" company by Rader and Loff, after which they searched for land on which to construct a camp for paramilitary training. In September, 1984, they located land near Priest Lake, Idaho, and purchased it with a down payment of $30,000. They were assisted in their purchase by Ardie McBrearty, a non-lawyer "legal adviser" who was paid $100,000 for his services, then and in the future.

Loff, Rader, Norton, and others also began purchasing weapons and supplies in large quantities. In September, 1984, Loff and Rader took $20,000 in loot to Las Vegas and spent it purchasing survival equipment. Three weeks later, they made a similar trip to Reno, Nevada, again spending approximately $20,000. Expenditures were made in the Spokane area for snowmobiles, all-terrain vehicles, and other supplies, including $10,000 in radio equipment.

In November, 1984, Loff gave Barnhill $50,000 to be used by Barnhill for establishing a "cell" in Montana. Shortly after that, as The Order began feeling heat, the decision was made to remove the remainder of the money from Loff's farm. The remainder of the money, with the exception of $70,000, was dug up and transferred by Rader to Norton's residence in Idaho. In November, 1984, Rader gave $200,000 of this cash to Scutari, who transferred it from Idaho to Portland to give it to the fugitive Mathews. In December, 1984, Loff and Norton took salary payments of $10,000 each to Spokane for Dye, Zaengle and Nash. The money was given to Dye and Zaengle. In January, Norton became alarmed at the arrest of Dye, Barnhill and Kemp and left Idaho for Missouri, taking with him an estimated $200,000.

YARBROUGH'S ASSAULT ON FEDERAL AGENTS ON OCTOBER 18, 1984:

On October 18, 1984, federal agents approached the residence of Gary Yarbrough in Sand Point, Idaho, and were fired upon by Yarbrough. A warrant was subsequently issued for the arrest of Yarbrough charging him with assaulting federal officers and he became a fugitive. A subsequent search of his residence revealed voluminous extremist literature, Order memorabilia, and weapons, including a machine gun identified as the weapon used to murder Alan Berg.

The Yarbrough incident created considerable heat on Order members in the Idaho-Eastern Washington area and resulted in the mid-November moves of Duey, Robert and Sharon Merki, and Sharon's son, Ian Royal Stewart, to three new safe houses located on Whidbey Island in Puget Sound.

Also, in November, Mathews, Scutari, and Silva moved from the Idaho-Eastern

Washington area to five new "safe houses" near Mount Hood, Oregon, where they were joined by several new recruits.

THE MATHEWS SHOOT-OUT IN PORTLAND ON NOVEMBER 24, 1984:

On November 24, 1984, Mathews and Yarbrough met with Thomas Martinez at a motel in Portland. During the meeting, Mathews briefly exited the motel room, spotted an FBI agent, and began a gun battle in which he fired at two agents with a handgun, striking one. The other agent, in turn, shot Mathews in the hand. Mathews escaped and eventually made his way to Whidbey Island where he was located by FBI agents on December 7, 1984. Following the shoot-out in Portland, Gary Yarbrough was captured at the Portland motel.

DEATH OF MATHEWS AND CAPTURE OF OTHERS ON WHIDBEY ISLAND ON DECEMBER 7-8, 1984:

On December 7, 1984, approximately one hundred FBI agents and local law enforcement authorities surrounded three residences on Whidbey Island where Mathews and a number of his followers were believed to be hiding. The occupant of one of these houses, Randolph George Duey, surrendered upon running out of the house and being confronted with FBI agents with automatic weapons. Duey was carrying a Uzi machine gun and a handgun and a subsequent search of the residence resulted in the recovery of a hand grenade and a quantity of C-4 plastic explosives. Also recovered from the Duey residence was approximately $10,206.20 in currency, as well as voluminous extreme right wing political material.

The occupants of the second house, Robert E. and Sharon K. Merki, also surrendered. A search of their house resulted in the recovery of approximately $25,524.10 in cash, an Uzi machine gun and numerous other weapons, and political materials. At the time of their arrest, the Merkis were both fugitives from counterfeiting charges in Oregon and Washington and bail jumping in Oregon.

The third house was occupied by Robert Mathews and Ian Royal Stewart, son of Sharon Merki. Stewart surrendered after a stand-off of approximately eight hours. When he voluntarily came out of the residence, he was carrying $40,000 in cash, including bills which apparently came from the Ukiah armored car robbery.

Mathews refused to surrender and died some 35 hours after the siege began, when the house caught fire and exploded due to explosives within it. During the 35 hours, Mathews engaged in a gun battle with the surrounding agents, firing machine guns at the agents and at a helicopter being used to monitor the situation.

Thereafter, most of the other members of The Order who remained at large were eventually tracked down and arrested by FBI agents.

To summarize Scutari's activities, he has been named in eight predicate acts. Several of these acts have already been discussed in the details but for clarification, will be discussed here briefly.

Predicate Act 15 is in regards to the Alan Berg murder in which evidence indicates that Scutari acted as a lookout during the incident. It should be made clear that the defendant at the time of his plea denied any involvement in this act and there has been no finding of guilt or innocence by the Court.

Predicate Act 18 discusses his involvement in the Ukiah bank robbery where 3.6 million dollars in currency was taken and the defendant was a participant.

Predicate Act 22 discusses the fact that the defendant used $5,200 in stolen money to purchase a car in Boise, Idaho on July 23, 1984.

Predicate Act 31 is actually a separate criminal act in where Scutari was part of a conspiracy to rob the Brinks vault in San Francisco in August of 1984.

Predicate Act 52 discusses the fact that Scutari received $220,000 of stolen money on November 23, 1984.

Predicate Act 65 discusses the defendant moving more than $5,000 from Whidbey Island to the State of Utah on December 6, 1984.

Predicate Act 66 discusses Scutari along with Mathews storing $40,000 of stolen money at Whidbey Island, and finally Predicate Act 67 discusses Scutari using $6,000 in stolen funds to purchase an automobile in Belen, New Mexico on December 11, 1984.

Investigators of this case reveal that Scutari served as the chief of security of The Order. He is highly qualified in martial arts and considered an expert with various firearms.

The defendant was also involved in a mock trial of a person known as William Soderquist in October of 1984. Reports reveal that Soderquist was threatened with his life as a result of this mock trial.

Law enforcement indicate that the defendant Scutari was one of the top five people of The Order and definitely one of the leaders.

The defendant was arrested in San Antonio, Texas on March 19, 1986 by Federal Bureau of Investigation agents after an exhaustive investigation since the defendant had been a fugitive for several months.

The defendant was arrested at his place of employment and told agents at the time of his arrest, "If I had gotten a gun you would have had to kill me". Although the defendant was not armed at the time of his arrest, a .45 automatic weapon was found in his vehicle along with a number

CENTRAL FILE

of other weapons which were found at his apartment.  In view of the defen-
dant's statements, it is apparent that Scutari is a very dangerous
individual.  He was well ingrained in The Bruders Schweigen and aside
from the various Predicate Acts and being in charge of security of The
Order, he also gave voice stress tests to new recruits and was considered
a close friend of Bob Mathews.

**Victim Impact Statement.**  The following are a list of crimes involving
victims which the evidence at trial indicated were committed by members
of "The Order" as part of the racketeering enterprise charged in the
Indictment:

| CRIME | VICTIM(S) | $ AMOUNT OF LOSS | DEFENDANT(S) INVOLVED |
|---|---|---|---|
| Armed Robbery of Worldwide Video Store Spokane, WA 10/28/83 | Kenneth R. Taylor Theresa Sullivan | $ 370 | Duey, Pierce (with Mathews & Dan Bauer) |
| Armed Robbery of Citibank, Innis Arden Branch, Seattle, WA 12/20/83 | Tami Lee Hyldahl Kathy Tomison Jean Stephens | $ 25,956 | (Robert Mathews) David Lane (accessory) |
| Armed Robbery of Washington Mutual Savings Bank Spokane, WA 1/30/84 | Gail Bailey Gail Fox | $ 3,181 | Bruce Pierce Gary Yarbrough |
| Armed Robbery of Continental Armed Transport Courier (at Fred Meyer Store Seattle, WA 3/16/84 | George King | $ 44,807 | Bruce Pierce Randy Duey (with Robert Mathews & Gary Yarbrough) |
| Armed Robbery of Continental Armored Transport Truck (Northgate Mall) Seattle, WA 4/23/85 | George King Robert White | Approx. $400,000 | Bruce Pierce Randy Duey Richard Kemp Gary Yarbrough Andy Barnhill (with Robert Mathews & Denver Parmenter) |

FILE

| CRIME | VICTIM(S) | $ AMOUNT OF LOSS | DEFENDANT(S) INVOLVED |
|---|---|---|---|
| Murder of Walter West, Idaho 5/27/85 | Walter West | ———— | Randy Duey Richard Kemp (with David Tate, Jim Dye, Robert Mathews & Tom Bentley) |
| Murder of Alan Berg, Denver, Colorado 6/18/85 | Alan Berg | ———— | Bruce Pierce David Lane Jean Craig (with Robert Mathews & Richard Scutari) |
| Armed Robbery of Brinks Armored Truck Ukiah, CA 7/18/85 | Lisa King | $3.6 million | Bruce Pierce Randy Duey Richard Kemp Gary Yarbrough Andy Barnhill (with Robert Mathews, Soderquist, Merki, Dye, Denver Parmenter & Richard Scutari) |

**Defendant's Version:**

"I summary of my offence:  I am guilty of driving a vehicle in an armoured car robbery, transporting stolen money, giving voice stress tests to new recruits, and I was on Widby Island with Bob Mathews a few days prior to the shoot out.

As to the why of my crime:  We needed the money.

/s/ Richard J. Scutari
5-14-86"

**PRIOR RECORD:**

The defendant claims that at age 16 he was arrested for public intoxication and disorderly conduct by the Naples, Florida Police Department.  The defendant claims that the matter was disposed of by the authorities releasing him to his parents.  This information could not be verified.

**Adult Record:**

Scutari was arrested on March 1, 1969 and charged with disorderly conduct by the Fort Walton Beach Police Department in Flordia. The defendant was allowed to forfeit $35 bail. No other information is known about this charge.

No other prior record was found on the defendant.

**PERSONAL & FAMILY DATA:**

**Defendant:** Scutari is the youngest of two sons born to the union of Fred and Margaret Scutari. He was born in Port Jefferson, New York and at age 9 the family relocated to Hollywood, Florida. The defendant was reared in this area until age 17 when he left the family setting to join the U.S. Navy.

The defendant's father was a carpenter and construction worker and apparently a good provider.

Scutari relates that the family is close knit and that his parents were upset over his arrest.

The defendant's father was interviewed and related that Scutari had no problems growing up. It is apparently difficult for the defendant's parents to realize the seriousness of Scutari's actions. The father remarked that he felt the news media had over reacted and in fact stated that while in high school, one of Scutari's close friends was Jewish.

The defendant's older brother, Frank, was sentenced to three years custody of the Attorney General out of the Southern District of Florida in Miami. He is presently serving his sentence at the Atlanta Federal Penitentiary. His conviction was in relation to Scutari's criminal activities regarding The Order. The defendant admits that his parents are somewhat angry and upset but are still supportive of the defendant. Scutari claims that his parents do not particularly agree with "The Order" and also acknowledges that his mother does not really understand The Order.

To summarize, investigation reveals the defendant has come from a normal loving family and apparently experienced no problems while growing up.

**Parents & Sibling:**

**Father:** Fred Scutari, age 69, resides at 4654 Dryfus Avenue, Stuart, Florida, retired.

**Mother:** Margaret Scutarie (nee) Coliccio, age 69, resides with husband and is a housewife.

**Brother:**  Frank James Scutari, age 42, serving a three year sentence at Atlanta Federal Penitentiary.

**Marital:**  On October 24, 1970, Scutari married Linda Voulo in New Orleans, Louisiana. Two children were born to this union by the name of Tina, age 16, and Richelle, age 15. Mrs. Scutari filed for and received a divorce in Stuart, Florida on December 21, 1976. Initially, the parents were given joint custody of the children, however, the defendant was to pay $200 per month child support along with $200 per month alimony. Court files reveal that the defendant made these payments.

Scutari claims that this marriage failed as he was employed in the oil fields approximately six months out of the year which caused considerable stress in their marriage. On February 3, 1977, the defendant's ex-wife relinquished custody of the children which was verified by court documents. The defendant claims that the children were, to quote his ex-wife, "in her way".

In 1978, it was agreed that the oldest child, Tina, would return to live with his ex-wife who apparently now resides in St. Petersburg, Florida. The defendant states he has had no contact with this child or his ex-wife in over two years.

Scutari continues to have custody of the second child, Richelle, who presently resides with his parents in Stuart, Florida.

Both daughters apparently have adjustment problems along with learning disabilities and are in special programs.

Scutari's second marriage occurred to Michele Pardee in Ft. Lauderdale, Florida in January of 1977. One child was born to this union by the name of Danelle, who is age 4. She is presently residing with her mother and maternal grandparents who reside in Pembrook Pines, Florida.

We have attempted to contact Mrs. Scutari, however, at the time of this dictation, this has not been accomplished.

The defendant claims that he has told his wife to file for a divorce because of his current criminal problems. He also relates that her parents dislike him and are very angry because of his criminal behavior.

**EDUCATION:**

Investigation reveals that the defendant completed the 11th grade at McArthur High School in Hollywood, Florida. A copy of his transcript reveals below average grades.

Upon leaving high school, the defendant joined the U.S. Navy and received his high school equivalency in 1965.

Scutari states that from April to September of 1985, he completed 600 hours of training as an auto technician and mechanic at the American Technical Institute in Tulsa, Oklahoma. The subject states he received a certificate. He used the name of Larry Michael Cupp. Inquiries have been sent to this institute but no reply has been received.

**EMPLOYMENT:**

From September 1985 through March of 1986 the subject was employed by Brake Check in San Antonio, Texas. He was employed as an alignment and front end specialist averaging $300 per week income. This employment terminated as the subject was arrested on the current offenses.

From October 1983 through June of 1984, Scutari was employed by Matteo and Grozza Builders in Stuart, Florida as a foreman building houses. His wages averaged $480 per week and the defendant claims he terminated this employment to join The Order.

Contact with this company revealed that the defendant was dependable and considered a good employee.

From May 1980 through October 1983 the defendant was self-employed in Stuart, Florida sub-contracting carpentry work.

From May 1968 through October 1979, he was employed by Taylor Diving & Salvage Company in Belle Chasse, Louisiana. He was employed as a diver working in the oil fields and earned $10.08 per hour. The defendant claims he terminated as he was away from his family six months out of the year. Contact with this company reveals that there was nothing derogatory in his file and he was considered a good diver.

**MILITARY RECORD:**

The defendant enlisted in the United States Navy on July 9, 1964 and received an honorable discharge on April 29, 1968. He left the service as a 3rd Class Engineman. The defendant claims that he did receive one Captain's Mast as he was out of uniform. Disposition was ten days restriction to base. Scutari commented that he was also brought before a second Captain's Mast and charged with fighting but was found not guilty.

**HEALTH:**

**Physical:** The defendant is 5'10 1/2" tall, weighing 175 pounds with brown hair and hazel eyes. He has a tattoo of a Navy diver's helmet on his right arm.

The defendant claims he is allergic to tetanus shots. In January of 1974, bone reconstruction surgery was conducted as a result of being kicked in the face from a karate opponent. Scutari claims this was an accident in which he received a broken cheekbone. In the same year of 1974, a piodinal cyst was removed.

The subject states he is in excellent health and apparently enjoys working out with weights.  He is also considered an expert in karate and other forms of martial arts.

The defendant admits to experimentation with marijuana as a young adult. He no longer uses any narcotics and has never been addicted to any drugs. He socially uses alcohol.

**Mental & Emotional**:  The defendant was found to be cooperative during the investigation and it appears that his statements have been truthful. He refuses to discuss anything in regards to the Alan Berg murder, but has commented as to his guilt in relation to the other offenses.

The subject was found to be polite and courteous during interviews and seems to possess at least average intelligence.

He claims to have never been treated for any mental or emotional disorder nor has he been referred for counseling.

**FINANCIAL CONDITION:**

The defendant denies any assets or or liabilities and has stated such on his financial form.

**EVALUATION:**

Scutari is a 39 year old male who has entered guilty pleas to Racketeering Activity, Conspiracy to Engage in Racketeering and Obstruction of Interstate Commerce by Robbery.  It appears that the defendant became involved in The Order in June of 1984.  He rapidly became one of the leaders and according to investigators, was chief of security.  The defendant was involved in the Ukiah robbery, the conspiracy to rob the Brinks vault in San Francisco, several of the Predicated Acts involving money and allegedly, a lookout during the Alan Berg murder.  The defendant has not pled to this act, nor has there been a finding of guilt.

Aside from two minor incidents, the defendant has no serious prior record and appears to have come from an intact and loving family.  Although his parents are supportive, they seem to have difficulty accepting the reality of their son's criminal behavior.  It appears that they do not understand his beliefs in Bruders Schweigen, nor do they particularly share the same beliefs.

The defendant has experienced two marriages and expresses concern over his children.  He appears to be in good health and is free of any mental or emotional disorders including drug or alcohol abuse.

In conclusion, Scutari is viewed as a dangerous individual who verbally stated to the authorities at the time of his arrest, that he would not have been taken alive if he had been armed. This would suggest that the subject is quite violent, especially in view of the fact that weapons were found in his apartment and vehicle. It is this writer's opinion that the sentence for Mr. Scutari should be fashioned accordingly.

Respectfully submitted,

William T. Peek
U.S. Probation Officer


APPROVED:
ROBERT B. LEE, Chief
U.S. Probation Officer


BY: Kenneth A. Wagner
Kenneth A. Wagner, Supervising
U.S. Probation Officer


WTP:sm
05/30/86





Nov 12   11:25 AM '87

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 87-CR-114

UNITED STATES OF AMERICA,

Plaintiff,

vs.

RICHARD SCUTARI

Defendant.

_____

J U D G M E N T

_____

This matter having come before the court and a jury of twelve persons on the 26th day of October, 1987, and the case having been duly submitted to the jury and the jury having rendered its verdict finding the defendant, Richard Scutari, not guilty; it is therefore

ORDERED that the indictment herein be and is hereby dismissed as to the defendant, Richard Scutari, and he is discharged thereon; it is further

ORDERED that the defendant, Richard Scutari, is remanded to the custody of the Attorney General of the United States.

BY ORDER:

RICHARD P. MATSCH, JUDGE

ENTERED:

JAMES R. MANSPEAKER, CLERK

Date: November 18, 1987

CENTRAL FILE



4

**UNITED STATES DISTRICT COURT**
WESTERN DISTRICT OF WASHINGTON
PROBATION OFFICE

**ROBERT B. LEE**
CHIEF PROBATION OFFICER

COLUMBIA CENTER
701 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98104-7024
206-553-7435

December 9, 1994

RECEIVED
WARDEN'S OFFICE

DEC 1 9 1994

UNITED STATES PENITENTIARY
MARION, ILLINOIS

Michael B. Cooksey, Warden
U.S. Penitentiary
Route 5, P.O. Box 2000
Marion, IL  62959

RE:  SCUTARI, Richard
Reg. #34840-080
Docket No. CR85-001M

Dear Warden Cooksey:

The presentence report prepared in this case contains information regarding the defendant's alleged participation in the murder of Alan Berg at Denver, Colorado on June 18, 1984.  The presentence report was prepared on May 27, 1986 and Mr. Scutari was sentenced on June 6, 1986.

He and three codefendants were subsequently tried for the murder of Alan Berg. Trial took place in the United States District Court for the District of Colorado at Denver on October 26, 1987 under docket number CR87-CR-114.  On November 18, 1987, Mr. Scutari was acquitted.  He has provided a Judgment from the District of Colorado noting the verdict of not guilty and ordering that the Indictment be dismissed.

In order to ensure that the Parole Commission and Bureau of Prisons are aware of his acquittal in the United States District Court for the District of Colorado, Judge McGovern has directed that this letter and a copy of the Judgment under docket number 87-CR-114 be attached to Mr. Scutari's presentence report and made a part of his Parole Commission file and his Bureau of Prisons file.

Michael B. Cooksey, Warden
December 9, 1994
Page 2

RE:  SCUTARI, Richard

Your cooperation in assisting the Court in this matter is appreciated.   Thank
you for your assistance.

Sincerely,

George H. Bosler
Supervising U.S. Probation Officer

GHB/kem
Attachments

cc:    United States Parole Commission
       North Central Region
       10920 Ambassador Drive
       Air World Center Suite 220
       Kansas City, MO 64153
       ATTN:  Mr. Jack F. Sicoli
       Regional Administrator



# M E M O R A N D U M
United States Probation Office
Western District of Washington

RECEIVED

NOV ~ 5 1994

WALTER T. McGOVERN
S. DISTRICT JUDGE

DATE:      November 21, 1994

TO:        The Honorable Walter T. McGovern
           Senior U.S. District Judge

FROM:      George H. Bosler
           Supervising U.S. Probation Officer

SUBJECT:   SCUTARI, Richard Joseph
           Docket No. CR85-001M

The defendant and numerous codefendants were members of a "White Supremacist Group" headquartered at Hayden Lake, Idaho and referred to as the Aryan Nation. The defendants were charged in a Second Superseding Indictment which alleged 21 counts of various criminal activities such as racketeering, armed robbery, interstate transportation of stolen money, and possession or use of explosives, a hand grenade, and a machine gun.  The defendant entered pleas of guilty to counts I and II of the Second Superseding Indictment and count II of an Indictment handed up in the Northern District of California under Docket No. 85-0476 which charged the defendant and others with the robbery of a Brinks armored car near Ukiah, California.

At the time of sentencing in the Western District of Washington, charges were also pending in the District of Colorado, Denver, alleging the defendant and three codefendants violated the civil rights of radio talk show host, Alan Berg by murdering Mr. Berg.  There are several references to this offense in the defendant's presentence report (please refer to shaded areas of attached report).  The defendant and a codefendant, Jean Margaret Craig, were acquitted of this offense while the other two codefendants were convicted.  The defendant believes that this information will have a negative impact upon the Parole Commission when deciding future issues such as classification and parole consideration.  It is felt the report accurately reflects the scope of the conspiracy and the activity of the individual conspirators.  However, we would make the following recommendation to Your Honor:

The Honorable Walter T. McGovern
November 21, 1994
Page 2

RE:  SCUTARI, Richard Joseph

**RECOMMENDATION:**

That a clarifying letter be forwarded to the Parole Commission as well as the Bureau of
Prisons to include the Judgment of Acquittal under Docket No. 87-CR-114 for the District
of Colorado.  It is felt this would adequately advise both the Parole Commission and the
Bureau of Prisons that the defendant was acquitted of the alleged civil rights violation.

Respectfully submitted,

George H. Bosler
Supervising U.S. Probation Officer

_____   Approved

_____   Disapproved

_____   Request Conference with Probation Officer

_____   _____
Senior U.S. District Judge   Date





AO 245 (Rev. 8-87) Judgment in a Criminal Case

# United States District Court

_____ WESTERN _____ DISTRICT OF ____ ARKANSAS ____

UNITED STATES OF AMERICA

V.                                                    JUDGMENT IN A CRIMINAL CASE

RICHARD JOSEPH SCUTARI          Case Number: 87-20008-04
615 Parker
Fort Smith, AR 72901

                                                    _____ Bill Perceful _____
(Name and Address of Defendant)                      Attorney for Defendant

THE DEFENDANT ENTERED A PLEA OF:

[☐ guilty   ☐ nolo contendere] as to count(s)_____, and
[X not guilty as to count(s) _One (1) and two (2)_____.

THERE WAS A:
[☐ finding   ☐ verdict] of guilty as to count(s)_____

THERE WAS A:
[☐ finding   X verdict] of not guilty as to count(s) _one (1) and two (2)_____
☐ judgment of acquittal as to count(s)_____
    The defendant is acquitted and discharged as to this/these count(s).

THE DEFENDANT IS CONVICTED OF THE OFFENSE(S) OF:

IT IS THE JUDGMENT OF THIS COURT THAT:   THE DEFENDANT IS ACQUITTED,
DISCHARGED, AND ANY BOND EXONERATED.

                        U. S. DISTRICT COURT
                        WESTERN DIST. ARKANSAS
                            F I L E D
April 7, 1988                                    _____
                        APR 11 1988
                                                 United States District Judge
                        CHRIS R. JOHNSON, Clerk
                        By _____
                            Deputy





United States Government

# memorandum

*United States Penitentiary*
*Administrative Maximum*
*Florence, Colorado  81226*

DATE: April 17, 2001

REPLY TO THE
ATTENTION OF:   Michael V. Pugh, Warden
ADX Florence

SUBJECT:   SCUTARI, Richard
Reg. No. 34840-080

TO:   G.L. Hershberger, Regional Director
North Central Region

ATTN:   Mike Junk, Regional Designator

1.   __XX__   Re-Apply Management Variable Greater Security (V)

2.   Rationale for Referral:  Inmate Scutari was transferred from USP Lompoc,
California, to ADX Florence, Colorado, for close supervision purposes.  On
September 29, 1998, he was involved in a physical altercation on the recreation
yard.  Although the incident report was expunged, it was determined his injuries
and influence among the white inmate population warranted a transfer.
Additionally, he has been identified as a Chief of Security for the violent Neo-Nazi
militant organization known as "The Order."  Due to his special security concerns,
we believe he is appropriately designated to ADX Florence, Colorado, and request
the management variable of greater security be re-applied.

Prepared By:  T. Sudlow, Case Manager

Staff have checked the following Sentry programs to ensure that they are correct and
current:

Security Designation Form (PPG0)
CMC Clearance and Separatee Data (PP10)
Chronological Disciplinary Record (PD15)
Inmate Profile (PP44)

Custody Classification Form (PPG6)
Sentence Computation (PSCD)
Inmate Load Data (PP41)





BP-S399.058   **TRANSFER ORI**   CDFRM
MAY 94

**U.S. DEPARTMENT OF JUSTICE**                    FEDERAL BUREAU OF PRISONS

---

In accordance with authority provided in Title 18, U.S. Code, Section 3621, and the authority delegated to me by the Director of the Bureau of Prisons, I hereby order transfer of:

| | |
|---|---|
| Name of Inmate: | Register No.: |
| SCUTARI, Richard | 34840-080 (M) |

From (Name of Institution and Location)

United States Penitentiary, Lompoc, California

To (Name of Institution and Location)

Administrative Maximum Penitentiary, (ADX)Florence, Colorado

| | |
|---|---|
| Reason for Transfer: | |
| Close Supervision | Transfer Code: |
| | 323 |
| Parole Status: | |
| N/A | Custody Classification: |
| | High/Max |

| | |
|---|---|
| Health Status: | Central Inmate Monitoring Case |
| Regular Duty; Clear for Transfer | ___ No |
| | XX  Yes-CIMC Assignment  Separation, BROAD PUB,SPEC SUP |

| | | |
|---|---|---|
| Signature of Transferring Authority | Title of Transferring Authority | Date |
| Mike Adams | Warden | 5/20/99 |

RETURN OF SERVICE - Pursuant hereto, I have this ___28th___ day of ___MAY___, 19_95_, executed the above order and committed the inmate to the institution indicated.

| | |
|---|---|
| Signature | Name |
| | R. VALDO? |
| Title | Agency |
| C. LEUTENANT | BOP/ADX |

For transfer to CTC's, complete the following:

| | |
|---|---|
| Projected release date | Type of release |
| Scheduled date and time of departure and transportation information | Scheduled date and time of arrival |

---

Record Copy - J & C; Copy - Central File

(This form may be replicated via WP)

Replaces BP-399(58) of OCT 88



9

EMS-409.051 REQUEST FOR TRANSFER/APPLICATION OF MANAGEMENT VARIABLE CDFRM
SEP 2006
U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| From: M. L. Rivera | Facility FCI Estill, SC 29918 | Date 5/7/08 |
|---|---|---|
| Inmate's Name SCUTARI, Richard Joseph | Register No. 34840-080 | |

To:
DSCC Administrator

_X_   Transfer to:   USP Marion, IL (CMU) Code 324 - Program Participation
____   Apply Management Variable(s) _____
____   Update Management Variable Expiration Date.  (New Date): _____

**1.   Inmate's Medical Status**

Scutari is assigned to CARE1 medical duty status.  The following restrictions are imposed: lower bunk required, soft shoes only, and no prolonged standing.  He is cleared to work in food service.  There are no known medical reasons which would prevent this transfer or his placement in general population.

**2.   Institution Adjustment**

Scutari arrived at FCI Estill, South Carolina, on February 12, 2008, as a lesser security transfer from USP Big Sandy, Kentucky.  Since his arrival, his adjustment has been average.  He has completed numerous classes with the education department during his term of incarceration. He does not have a financial obligation.

**3.   Rationale for Referral.**

Scutari is classified as a MEDIUM security inmate with IN custody.  He is serving a 60-year sentence.  His projected release date is September 11, 2025, via Good Conduct Time. Inmate Scutari requires transfer to a Federal Bureau of Prisons (Bureau) facility which allows management of communication with persons in the community through more effective monitoring of telephone use, written correspondence, and visiting.

The transfer to this facility, the Communications Monitoring Unit (CMU) at USP Marion, Illinois, under these conditions is based on the following specific information: Inmate Scutari's current offenses of conviction include Racketeering Activity, Conspiracy to Engage in Racketeering Activity, Obstruction of Interstate Commerce by Robbery.  He has been identified as a founding member of "The Order," a group considered a domestic terrorist organization.  While incarcerated, he has continued to communicate with members of extremist organizations.  His contact with persons in the community requires heightened controls and review.

Based on this information, the transfer of inmate Scutari to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public.

| 4a.   Parole Hearing Scheduled:  ___ Yes ___ No | b.  If yes, when _____ |
|---|---|

**5.   Note any past or present behavior and/or management/inmate concerns.**

See current offense.

**6.   BP337/BP338 Discrepancies.**

Changes in the *Security Designation and Custody Classification Manual* have caused scoring of priors to be eliminated on the BP338; however, the BP338 now addresses the following items not reflected on the BP337: education level, criminal history score, and age category.  The BP337 does not indicate a history of escape or violence.  According to available documentation, Scutari was involved in a plan to escape while at FCI Memphis in 1987.  There was also a plan to assault the institution's secure perimeter during this attempted escape.  This incident has resulted in the BP338 being updated to reflect a serious history of Escape and Violence occurring more than 15 years ago.  All other categories remain unchanged.

DSCC Renault
Carlson
5-7-08

Staff have checked the following SENTRY Programs to ensure that they are correct and current:

| | |
|---|---|
| Inmate Profile | CIM Clearance and Separatee Data |
| Inmate Load Data | Custody Classification Form |
| Sentence Computation | Chronological Disciplinary Record |

| Prepared by: | Unit Manager Signature: |
|---|---|
| C. Rhodes / *C. Rhodes* | L. Carlson *[signature]* |

If the transfer is approved, a Progress Report will be completed prior to transfer.
*For Mariel Cuban Detainees - Staff have entered the CMA Assignment of "CRP RV DT" to indicate the need for a Cuban Review Panel Hearing four months from his/her Roll-Over Date.

*(This form may be replicated via WP)*                    *This form replaces EMS-409 of DEC 99*







**U.S. Department of Justice**

National Security Division

*Washington, D.C. 20530*

Mr. Richard Scutari
Federal Register No. 34840-989
U.S.P. Marion - CMU
P.O.Box 1000
Marion, IL  62959

FEB - 2

NSD FOI/PA NO. 09-004

Dear Mr. Scutari:

This is in response to your letter dated August 14, 2008, requesting information on yourself. Your Freedom of Information Act (FOIA) request was received by the National Security Division (NSD) on October 15, 2008.

In response to your request, this office conducted a search of records of the Office of the Assistant Attorney General, the policy and correspondence files within the Office of Intelligence (formerly the Office of Intelligence Policy and Review), and the files of the Counterterrorism and Counterespionage Sections. We did not locate any NSD records responsive to your request.

We did, however, locate records which originated with the Federal Bureau of Prisons (BOP). Pursuant to Department practice, we have referred these documents to BOP for processing and direct response to you.

If you are not satisfied with this response, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, 1425 New York Avenue, NW, Suite 11050, Washington, DC 20530-0001. Your appeal must be received within sixty days from the date of this letter. Both the letter and envelope should be clearly marked, "Freedom of Information Act Appeal."

Sincerely,

Arnetta James
FOIA Coordinator

193640

7019 1120 0001 3573 2651



1006



98101

U.S. POSTAGE PAID
FCM LG ENV
MENDOTA, CA
93640
SEP 11 '20
AMOUNT
$0.00
R2305H128745-09

United States District Court

Western District of Washington

700 Stewart Street

Seattle, WA

98101

FILED
LODGED
RECEIVED

MAIL

SEP 14 2020

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY





Legal Mail